IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SARA WECKHORST,

     Plaintiff,

     v.                                                    Case No. 16-CV-2255-JAR-GEB

KANSAS STATE UNIVERSITY,

     Defendant.

## MEMORANDUM AND ORDER

Plaintiff Sara Weckhorst brings this action against Defendant Kansas State University ("KSU"), alleging that KSU failed to adequately respond after Plaintiff, a KSU student, reported she was sexually assaulted at a KSU fraternity.  Plaintiff alleges the following three claims: (1) violation of Title IX; (2) violation of the Kansas Consumer Protection Act ("KCPA"); and (3) negligence.  This matter comes before the Court on KSU's Motion to Dismiss for Failure to State a Claim (Doc. 12), Plaintiff's Motion for Leave to Amend Complaint (Doc. 36), and KSU's Motion to Strike Portions of Proposed First Amended Complaint (Doc. 40).  The parties have fully briefed the motions.

Additionally, the United States has filed a Statement of Interest (Doc. 26), to which KSU has responded (Doc. 35).  The United States submits its Statement of Interest pursuant to 28 U.S.C. § 517, which provides that

> [t]he Solicitor General, or any officer of the Department of Justice, may be sent
> by the Attorney General to any State or district in the United States to attend to
> the interests of the United States in a suit pending in a court of the United States
> . . . or to attend to any other interest of the United States.

The United States asserts it has an interest in this case because the United States Departments of Justice and Education share responsibility for enforcing Title IX in the education context, and

because it has an interest in ensuring "effective private enforcement of Title IX in court" (Doc. 26 at 9).  KSU argues that the Court should not consider the United States' Statement of Interest, because Plaintiff's administrative complaint is still pending before the Department of Education's Office of Civil Rights ("OCR"), and thus the United States should remain neutral in this litigation.  Notwithstanding the apparently ongoing administrative proceedings before the OCR, the Court sees no reason why the United States cannot submit a statement of interest pursuant to § 517 to advance the various interests it has identified.  Accordingly, the Court has considered the United States' Statement of Interest as well as KSU's response thereto.

Having considered the parties' and the United States' briefings, the Court is now prepared to rule.  For the reasons stated in detail below, the Court grants in part and denies in part KSU's motion to dismiss, denies Plaintiff's motion for leave to amend, and grants in part KSU's motion to strike.

## I.      Motion to Dismiss

### A.      Standard

To survive a motion to dismiss for failure to state a claim, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[1]  To state a claim for relief under Rule 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[2]  The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[3]  "[M]ere 'labels and conclusions,' and

---

[1]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[2]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[3]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[6]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[7]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

## B.   Factual Background

The following facts are taken from Plaintiff's Complaint and are construed in the light most favorable to Plaintiff.  At all times relevant to this case, Plaintiff was a student at KSU.

### KSU Fraternities

KSU fraternities are student housing organizations that are open only to KSU students. On its website, KSU describes its fraternities as "Kansas State University Organizations."

---

[4]*Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5]*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6]*Id.*

[7]*Id.* at 679

[8]*Id.*

[9]*Id.* at 678.

Plaintiff alleges that 21% of the undergraduate population at KSU is affiliated with campus fraternities and sororities.  The fraternities collect rent and dues from their student members, and provide housing at off-campus locations.  The fraternities are overseen by national chapters as well as by KSU.  The Director of the fraternity relevant to this cause of action is a KSU instructor.

In its promotional materials, KSU describes the relationship between the University and the Greek Community:

> The Greek community at Kansas State University has been in existence since 1913, with a continuing tradition of excellence. Through the years we have been a community that fosters academic excellence, leadership ability, philanthropic services, and active contributions to both the campus and Manhattan communities. Our Greek community consists of 17 sororities and 28 fraternities, with a total membership of almost 4,000 undergraduate students. While each organization maintains its own activities, traditions, and national affiliations, each is founded on similar principles of scholarship, leadership, community service, and lifelong friendship.[10]

KSU further states in materials intended for parents of students:

> The Greek experience at K-State provides a safe and fun way to maximize the college experience.  Your son or daughter will also find personal growth and development extending far beyond his or her years on campus.[11]

Additionally, KSU employs five individuals in its Office of Greek Affairs, which is located in the KSU Student Union.  The Office of Greek Affairs is responsible for carrying out a number of functions to support fraternities and sororities, including administrative assistance, advisory responsibilities, education and development, serving as a liaison to chapter presidents, holding regular meetings with chapters, and conducting chapter assessments.  KSU has the authority to regulate fraternity houses, and promulgates rules for regulating parties and certain other activities at fraternity houses and events.

---

[10]Doc. 1 at 16.

[11]*Id.*

**Alleged Sexual Assaults**

On April 26, 2014, Plaintiff Sara Weckhorst attended a fraternity event at Pillsbury Crossing, a frequent K-State party location not far from campus.  Plaintiff became extremely intoxicated and blacked out.  Her last memory was speaking with a new acquaintance, J.F., a fellow KSU student and the fraternity's designated driver for the party.  J.F. took Plaintiff into his truck and raped her while about fifteen KSU students looked on, some taking video and photographs.  J.F. then transported Plaintiff to the fraternity house, which is situated about a quarter-mile from campus.

On the drive to the fraternity house, he assaulted her again.  Once at the fraternity house, J.F. took Sara to the "sleep room," which was lined with beds, and raped her again.  When he was finished, J.F. left her there, naked and passed out, and joined other fraternity members in partying downstairs.  Several hours later, at about 10:00 p.m., Plaintiff awoke from blackout, not knowing where she was or how she got there.  A man she did not know was raping her from behind.  Plaintiff later learned the man was J.G., a KSU student and a member of the fraternity. Still very intoxicated and confused, Plaintiff made her way out of the bed and to a nearby patio. J.G. followed her to the patio and raped her again.  J.G. informed Plaintiff that two fraternity brothers had penetrated her in the same day.  Plaintiff began to cry uncontrollably, having no recollection of the earlier sexual assaults.  She retrieved her clothing and went home.  Plaintiff later received a text from a KSU student stating "heard you got fucked at the lake," and stating rumors about her.  Plaintiff further alleges that photographs and videos of her were posted on social media and widely spread.

Plaintiff wanted to receive medical treatment the following day from the KSU Lafene Health Center, but it was closed.  Plaintiff went to the Health Center the following day and

received emergency contraception to prevent pregnancy from the rapes.  Plaintiff next went to

Mercy Regional Health Center, where a sexual assault nurse performed a rape kit to collect

evidence of the assaults on her body.  The rape kit procedure is an extremely intense and

invasive process which takes hours. The rape kit included an examiner placing a probe in

Plaintiff's vagina, taking samples off her skin and under her fingernails, combing

through her pubic hair, and taking pictures of her body and vagina. Plaintiff also received

antibiotics to prevent the transmission of sexually transmitted diseases she might have contracted

from the rapes.

### Plaintiff's Report of Sexual Assault and KSU Response

Plaintiff sought help from the KSU Women's Center and the Manhattan Rape Crisis

Center.  Mary Todd, the director of the Women's Center, assisted Plaintiff in drafting and filing

a complaint against the two student-assailants with the KSU Affirmative Action Office.  On May

5, 2014, Plaintiff met with KSU investigator Ameerah McBride of the Office of Affirmative

Action, who was charged with enforcing the University's sexual misconduct policy.  Ms.

McBride explained that KSU would do nothing about the rapes or the two student-assailants

because the rapes occurred off-campus.  Though the alleged student-assailants violated the KSU

Student Conduct Code, KSU would not investigate or take action to hold the student-assailants

responsible, remove them from campus, or sanction them.  Ms. McBride cited KSU's policy

against investigating off-campus sexual violence unless it occurs at a University-sponsored event

or the sexual violence relates to discrimination, harassment, or retaliation that occurs on campus.

After Ms. McBride informed Plaintiff that KSU would not take any action on her behalf, Ms.

McBride called the student-assailants to inform them Plaintiff had filed charges against them for

rape.

After meeting with Ms. McBride, Plaintiff went to the Riley County Police Department to report the rapes.  Plaintiff also met with Karen Low, Assistant Dean for the Office of Student Life, and Heather Reed, Associate Dean for the Office of Student Life.  Deans Low and Reed again told Plaintiff they would not investigate her report because the sexual assault allegedly occurred off campus.  Deans Low and Reed also told Plaintiff the fraternity was already on probation for previous misconduct and if she filed a report about the alcohol present at their parties, KSU would be able to suspend the chapter.  At Deans Low and Reed's request, Plaintiff filed an anonymous report about the presence of alcohol at the fraternity party.  In response, the Dean of Student Life, Pat Bosco, approved KSU's Interfraternity Council's ("IFC") decision to suspend the fraternity for the alcohol at the party at which Plaintiff was raped.

KSU also suggested Plaintiff avail herself of the "Wildcat Walks" program, where fellow students accompany students as they walk around campus.  KSU also recommended "Safe Ride," where fellow students drive students home on weekends.  KSU also gave Plaintiff the number for campus police.  KSU did not investigate the student-assailants and did not take corrective action against them.[12]

On May 21, 2014, Ms. McBride informed Plaintiff that KSU would investigate online comments about Plaintiff by unidentified individuals on social media, which occurred following the rapes.  However, such investigation would not lead to the sanction, expulsion, or any accountability of the two student-assailants.  In response, Plaintiff and her parents made clear to KSU their dismay that KSU refused to respond to the rapes and their concern about Plaintiff's safety on campus and ability to access her education.  Plaintiff wrote to Ms. McBride:

---

[12]Plaintiff has submitted a Motion for Leave to Amend (Doc. 36) to join fellow KSU student Crystal Stroup as a Plaintiff.  In support of her motion, Plaintiff has submitted a proposed First Amended Complaint, in which she alleges that after J.G. was arrested and charged for the sexual assault of Ms. Stroup and Plaintiff, KSU engaged in a threat assessment and expelled him from campus.  Doc. 36-1 at 17.

This has been a confusing and frustrating process since the moment I stepped into your Affirmative Action Office. At our first meeting I made it very clear that I was raped three times and that it was by two of my fellow Kansas State University students. [J.F.], designated driver of the day and member of [the fraternity] raped me quite publicly at Pillsbury Crossing. This designated driver ([J.F.]) was well aware that I had been drinking and knew I was unable to give consent. He relocated me (again without my ability to give consent) to his [fraternity] house. Where he raped me again (and, yes, again without my consent). When he was finished with me, he relocated me to [the fraternity's] sleeping room where another individual ([J.G.]) raped me. And that was how I woke up/came to…I was being raped again (and I did NOT nor was I able to give consent). It was [J.G.]/rapist #2 who told me I had already been raped twice by [J.F.]/rapist #1. Even so, you told me that you would not investigate ANY of this. What you WOULD, however, investigate was sexual harassment that occurred after these THREE SEXUAL ASSAULTS because Kansas State wants to hide behind a vague policy that it all took place off campus. How is it that a fraternity house is off campus but KSU can charge them with drinking violations (also not a university sponsored function) but not raping me? And then have the audacity to ask me to file a report turning them in for drinking but not raping me.

I told you at our first meeting that it was very difficult for me to be fully engaged in classes knowing what people are saying and thinking about me as everything has been put out on the yik-yak app and various forms of social media. I told you that many people were calling me and texting me wanting to know what happened. I told you that the yik-yak app was most damaging but since that was an anonymous app, it was difficult to say who was behind the awful stories and harassment and possible video of the Pillsbury Crossing rape by [J.F.]. My mother sat in this same meeting and questioned why will you not go after the acts of sexual violence and assault by your students and only investigate sexual harassment that these two rapists may or may not be a part of. Again, you couched all your terms in that these three rapes happened off campus and K-State will do NOTHING therefore to eliminate these individuals from campus. And, yet the very day of our first meeting, you contact them and tell them charges have been filed against them. I completely FAIL TO UNDERSTAND why based on what I shared with you at this meeting why you felt it necessary to tell them charges were filed. What were your charges based on? If you can't go after them for raping me THREE times, what did you feel was going to be accomplished by talking with them about an anonymous yik-yak app and providing them my written statement before giving the police a chance to criminally investigate them?

Shortly thereafter you told Mary Todd that you had turned this entire situation over to university legal counsel and were waiting on direction from them and meanwhile my mother spoke with Heather Reed who told my mother that the investigation had ceased completely. Do you understand my confusion, not to mention my fear in being on campus with these men while trying to prepare for

and take finals?  No one from the University has once reached out to keep us informed.  If we didn't call, we didn't hear FROM ANYONE.

Based on my experience to date, I feel like I have done my best to follow this process in the correct way and it has been a complete miscarriage on the part of AAO and K-State.  What more can I supply only to have it too damage my self-esteem, my collegiate endeavors, my safety on campus, my belief in justice?  You were provided with a complaint form filed by Mary Todd with an addendum reporting the second rape by [J.F.].  You have a statement via mandatory reporter.  I fully understand why victims of crimes such as this do not come forward.  They are (as I am) victimized again and again by institutions that refuse to do the right thing even when our nation is screaming loud and clear that sweeping these sexual violent crimes under the carpet and excusing these offenders must stop. It is my sincere hope that Kansas State University's investigation leads to [J.F.] and [J.G.]'s permanent expulsion for my safety and that of all female K-State students.[13]

Plaintiff's parents provided a similar message to Ms. McBride:

Our daughter's letter and all of her statements have consistently detailed the ongoing issues of discrimination and humiliation resulting from the sexual assaults and the impact on her campus safety and wellbeing . . . [W]e have consistently asked for an investigation and our expectations have not changed. The fact that you can address off campus alcohol related behaviors with a fraternity, but cannot address a rape culture by that same fraternity is appalling. Our expectations for a University investigation and support for our daughter and future victims remains.  Sara has been incredibly brave and forthcoming with her experience and our family remains committed to justice and safety . . . .  Let there be no misunderstanding, our expectations remain that the University has both a moral and legal obligation to take action to protect Sara's right to a safe educational environment and to ensure the wellbeing of future students.

*** 

[W]e find it incredibly condescending and insulting that you closed your May 21 letter indicating that you value Sara's presence at KSU and your commitment to maintaining an environment free of harassment.  Your limited and untimely actions do not support this statement at all and we are left hoping that the University might actually learn from this experience so that other families do not have to experience the added trauma of an ineffective University response.[14]

---

[13]Doc. 1 at 9–11.

[14]*Id.* at 11.

Over the months following the assaults, Plaintiff and her family continued to request KSU to investigate the rapes, and KSU repeatedly declined to do so.  On June 5, 2014, Plaintiff, accompanied by her family, met with Dean Low, Office of Student Life Assistant Dean Scott Jones, and Affirmative Action Office Interim Director Roberto Malenado-Franzen.  Plaintiff and her family again requested that KSU investigate the rapes and expressed the extraordinary toll the assaults and KSU's refusal to investigate had on Plaintiff's mental health, education, wellbeing, and self-worth.  They explained the safety concerns she had about spending the next two years on campus with the alleged student-assailants.  In response, the KSU officials again told Plaintiff that because this was an off-campus rape, nothing could be done.

In response to KSU's refusal to investigate, Plaintiff's mother read and gave Deans Low and Jones, and Mr. Malenado-Franzen, a letter describing how the rapes "bleed over" into Plaintiff's education, thereby creating a hostile environment:

> This "bleed over" is all over everything . . . her safety, her self-worth, her ability to fairly seek an education.  This "bleed over" has seeped all over your campus and it has seeped so deep into her mind and soul, I do not know if she will ever be able to recover. This will continue to affect our daughter for the rest of her life. No diplomacy or glad-handing done here today will ever band-aid what has been done by this facility of higher education.  How does "bleed over" stop if you allow [J.F.] and [J.G.] to stay on campus right along side Sara?[15]

After this meeting, and without warning Plaintiff, and without her permission or consent, Dean Scott pulled language from an email Plaintiff had written to KSU voicing her frustration with the University's refusal to investigate the alleged sexual assaults, put her words into a complaint, attached her name to it, and submitted it to the KSU Office of Greek Affairs, as well as the IFC board, which consists of KSU students.  The complaint included highly sensitive information, including Plaintiff's full name and a detailed description of the multiple rapes.

---

[15]*Id.* at 12.

Plaintiff alleges the complaint was a superficial cover to give an appearance of action. The Office of Greek Affairs did not have jurisdiction to punish the student-assailants, only the fraternity.

Following Plaintiff's reports, the alleged assailants remained on camps, leaving her in constant fear that she would encounter them at any time. Plaintiff lost her sense of security, and is always afraid, apprehensive, and hyper-alert, on-campus and off. At least once a day on-campus, Plaintiff is overcome by panic, anxious that any passing man could be one of the student-assailants. She is constantly on the lookout for J.F. On one occasion, while walking to the KSU library, she passed a man who turned toward her. Plaintiff jumped, screamed, and began to cry. She only uses campus resources like the library when she is joined by friends or her Chi Omega sorority sisters, and otherwise stays home to avoid being alone in a campus setting. Since the sexual assaults and KSU's refusal to investigate the alleged assailants, Plaintiff has exhibited symptoms of post-traumatic stress disorder, a physical manifestation of the distress, involving bodily symptoms.

The first semester that KSU refused to investigate, Plaintiff stopped going to classes and was forced to withdraw from her math course. Listening to attendance on the first day of classes, Plaintiff is overwhelmed with anxiety, waiting to hear if the names of the student-assailants, their friends, or the fraternity members who watched the first assaults are called. She continues to have incessant thoughts about what happened, which interferes with her ability to concentrate in class. Plaintiff fears she could be sitting next to J.G. in a class or in the library and not even know it because she cannot recall anything about his appearance. Plaintiff's grades have plummeted, and as a result she lost the prestigious "Purple and White" scholarship awarded to her by KSU, causing her to have to pay additional tuition.

11

Since the assaults and KSU's refusal to investigate, Plaintiff has also distanced herself from her parents and friends.  She is afraid of being noticed, and she has decreased her involvement in her sorority and philanthropy and has turned down leadership opportunities. Plaintiff now finds it difficult to talk to people she does not know.  Recently, one of the alleged assailants came into Plaintiff's place of work, which caused her to have a severe panic attack. Since the encounter, she has felt increasingly unsafe, insecure, and threatened.

### KSU Sexual Assault Policies

KSU defines "harassment" in the "academic environment" as conduct toward a person based on sex that "has the purpose and effect" of "creating an intimidating, hostile, or offensive educational environment for the person" or "unreasonably interfering with the academic performance or participation in any university-sponsored activity of the person" or "threatening the academic opportunities of the person" and is sufficiently severe or pervasive that it alters the terms, conditions, or privileges of the person's academic opportunities or participation in university-sponsored activities."[16]

Plaintiff alleges that several KSU employees disagreed with the approach of not investigating fraternity sexual assault and expressed to University officials the concern that off-campus rape does affect a student's on-campus experience.  University officials told employees that because there is so much misconduct at fraternities, KSU had taken the position to do its best to not investigate or adjudicate that misconduct, including reports of rape, purposely attempting to maintain a chasm between KSU and incidents that happen off-campus.

---

[16]*Id.* at 6.

C.      Discussion

1.      Count 1—Title IX Claim

Plaintiff alleges a violation of Title IX in Count 1 of the Complaint on the basis that KSU was deliberately indifferent to her report of sexual assault, which was so severe, pervasive, and objectively offensive as to deny her access to, and the benefits of, an educational program or activity of a federal funding recipient.  Title IX provides for a private right of action against a federally funded education institution based on peer sexual harassment "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."[17]  As a threshold matter, to state a Title IX claim a plaintiff must allege that the discrimination occurred within an educational "program or activity" of the funding recipient.[18]  Additionally, the plaintiff must allege that the funding recipient (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) sexual harassment that is so severe, pervasive, and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school.[19]  Finally, the plaintiff must allege that the funding recipient's deliberate indifference subjected her to harassment by, at a minimum, alleging that the deliberate indifference "'cause[d her] to undergo' harassment" or made her "liable or vulnerable" to it.[20]

A Title IX plaintiff may proceed under two theories of liability.  A plaintiff may allege that the funding recipient had actual knowledge of, and was deliberately indifferent to, prior

---

[17] 20 U.S.C. § 1681(a); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

[18] 20 U.S.C. § 1681(a); *see Davis,* 526 U.S. at 633, 645–47 (explaining that Title IX liability is limited to circumstances wherein the funding recipient can be said "to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs").

[19] *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

[20] *Davis*, 526 U.S. at 644–45.

complaints of harassment, which led to the current harassment for which redress is sought.[21]

Alternatively, a plaintiff may allege that the funding recipient was on notice of, and was

deliberately indifferent to, the plaintiff's complaints concerning the current harassment, which

deprived the plaintiff of the educational benefits and opportunities provided by the funding

recipient.[22]  In her Complaint, Plaintiff appears to proceed on both theories of liability.[23]

However, in her response to KSU's motion, Plaintiff disclaims any theory of liability premised

on notice of and deliberate indifference to sexual assaults that occurred prior to the sexual assault

perpetrated against her.[24]  The Court therefore construes Plaintiff's claim as alleging that KSU

had actual knowledge of and was deliberately indifferent to her report of sexual assault, rather

than deliberately indifferent to known previous reports by other KSU students.

KSU makes two primary arguments in support of its motion to dismiss Plaintiff's Title IX

claim.[25]  First, KSU argues the alleged sexual assault did not occur within one of its "programs

or activities."  Second, KSU contends that Plaintiff has failed to allege that its deliberate

indifference to Plaintiff's reports of rape caused her to suffer further harassment.  KSU does not

argue that Plaintiff has failed to allege the other four elements of a Title IX claim, i.e., actual

knowledge, deliberate indifference, severe or pervasive harassment, and deprivation of access to

---

[21]*Rost*, 511 F.3d at 1119.

[22]*Id.* (recognizing the two different theories of liability and the split among district courts as to whether "notice of the current harassment for which redress is sought triggers liability"); *see also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152–53 (10th Cir. 2006).

[23]Doc. 1 at 22–23 (alleging that KSU had actual knowledge of both the sexual assault of Plaintiff and earlier instances of sexual assault against other students, and alleging that KSU was deliberately indifferent to previous allegations of sexual assault at KSU fraternities, as well as Plaintiff's report of rape).

[24]Doc. 27 at 7 n.1.

[25]KSU made a third argument, that is, Plaintiff failed to properly allege that KSU had any actual knowledge of or was deliberately indifferent to sexual assault reports prior to Plaintiff's report.  Doc. 13 at 20–25.  As explained above, Plaintiff has abandoned any Title IX claims premised on prior reports of sexual assaults of other students. Therefore, the Court need not address Defendant's arguments as to actual knowledge and deliberate indifference regarding prior reports of sexual assault.

education.[26]  The Court therefore confines its analysis to whether Plaintiff has alleged that the sexual assault occurred within a KSU "program or activity," and whether Plaintiff has alleged—and whether she was required to allege—further harassment after her report of rape.

### a.    Harassment Under an Education Program or Activity[27]

Title IX is triggered only when harassment occurs within an "education program or activity" of the funding recipient.[28]  The term "program or activity" includes "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education."[29]  According to OCR regulations, "program or activity" also includes "any academic, extracurricular, research, [or] occupational training."[30]  Plaintiff and the United States also refer to Dear Colleague Letters and "Questions and Answers" documents issued by the OCR, which bear on the scope of Title IX liability and purport to interpret how Title IX applies to fraternities and sororities.  KSU responds that these documents do not carry the force of law and are not entitled to *Chevron* deference in part because they were not promulgated pursuant to notice-and-comment rulemaking.[31]  The Court agrees and therefore does not consider the Dear Colleague Letters and "Questions and Answers" documents in determining whether Plaintiff has alleged a plausible Title IX claim.[32]

---

[26]*See* Doc. 32 at 13 n.3.

[27]The Court uses the term "harassment" to comport with the language of Title IX, not to suggest that Plaintiff's allegation of rape equates to mere harassment.  *See Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1132 n.3 (D. Or. 2016).

[28]20 U.S.C. § 1681(a); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999).

[29]20 U.S.C. § 1687.

[30]34 C.F.R. § 106.31.

[31]*See generally Chevron, U.S.A., Inc. v. Nat. Res.'s Def. Council*, 467 U.S. 837 (1984).

[32]*See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("we confront an interpretation contained in an opinion letter, not one arrived after, for example, a formal adjudication or notice-and-comment rulemaking.  Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference"); *Mission Grp. Kan., Inc. v. Riley*, 146 F.3d 775, 781–82 (10th Cir. 1998); *J.M. v. Dep't of Educ., State of Haw.*, No. 15-00405

In *Davis Next Friend of LaShonda D. v. Monroe County Board of Education*, the Supreme Court explained that harassment takes place under a "program or activity" of a funding recipient only when "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs."[33]  The Court found that the harassment at issue in *Davis* took place under a "program or activity" because the harassment occurred "during school hours and on school grounds—the bulk of G.F.'s misconduct, in fact, took place in the classroom."[34]

Since the ruling in *Davis*, courts have repeatedly encountered Title IX cases in which sexual harassment or assault occurs off school grounds.  For example, in *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, the Tenth Circuit found that a school district could have reasonably believed that it did not have responsibility or control over several incidents of harassment that occurred off school grounds and in private settings.[35]  The court explained that "there must be some nexus between the out-of-school conduct and the school" to impose Title IX liability.[36]  Applying this standard, the court held that the school district was not liable under Title IX in part because there was no nexus between out-of-school harassment and the school, where "the only link to the school was an oblique and general reference to harassment or teasing on the school bus or in the halls at school."[37]  By contrast, in *Simpson v. University of Colorado Boulder*, the Tenth Circuit reversed a district court's grant of summary judgment in favor of a

---

LEK-KJM, 2016 WL 7029825, at *10 (D. Haw. Dec. 1, 2016) (holding that OCR Dear Colleague Letter was "merely aspirational" and "merely provide[d] guidance for schools, not requirements").

[33]*Davis*, 526 U.S. at 645.

[34]*Id.*

[35]511 F.3d 1114, 1122 (10th Cir. 2008).

[36]*Id.* at 1121 n.1.

[37]*Id.*

university on the plaintiffs' Title IX claim.[38]  The court found the plaintiffs had presented sufficient evidence that the university exercised "control over the harasser and the environment in which the harassment occurs," because the sexual assaults at issue, which occurred at a private apartment off campus, were the result of an official policy by the university's football program to encourage female students to show recruits "a good time."[39]

In *Ostrander v. Duggan*, the Eighth Circuit held that a sexual assault of a university student by another student who was a member of a fraternity, at a private residence that was not owned by the fraternity or the university, was not harassment under a "program or activity."[40] The Eighth Circuit recently held in *Roe v. St. Louis University* that a sexual assault by a fraternity pledge perpetrated against another university student, at a party at an off-campus apartment, did not occur under a university "program or activity."[41]  In *C.R.K. v. U.S.D. 260*, this Court found reasonable a school principal's conclusion that harassment was "out of the school's jurisdiction and was up to criminal justice authorities to investigate," where the incident at issue did not take place on school grounds or at a school activity, and occurred when school was not in session.[42]  Finally, in *Samuelson v. Oregon State University*, the District of Oregon found that Title IX was not implicated based on a peer sexual assault, where both the alleged drugging and assault of the victim occurred at two separate off-campus apartments "that simply happened to be located in the same city as the university."[43]

---

[38]500 F.3d 1170, 1178–85 (10th Cir. 2007).

[39]*Id.*

[40]341 F.3d 745, 750–51 (8th Cir. 2003).

[41]746 F.3d 874, 884 (8th Cir. 2014).

[42]176 F. Supp. 2d 1145, 1164 (D. Kan. 2001).

[43]162 F. Supp. 2d 1123, 1131–32 (D. Or. 2016).

Plaintiff alleges the following facts in her Complaint that reflect KSU's substantial control over the context in which the assaults occurred here:  (1) KSU fraternities are student housing organizations that are open only to KSU students, and on its website, KSU describes its fraternities as "Kansas State University Organizations"; (2) the director of the fraternity at issue in this case is a KSU instructor; (3) KSU promotes its fraternities on its website and to prospective students and parents; (4) KSU employs five individuals on campus in its Office of Greek Affairs, which is responsible for carrying out a number of functions to support fraternities and sororities, including administrative assistance, advisory responsibilities, education and development, serving as a liaison to chapter presidents, holding regular meetings with chapters, and conducting chapter assessments; (5) KSU has the authority to regulate fraternity houses, and promulgates rules for regulating parties and certain other activities at fraternity houses and events; and (6) Dean of Student Life, Pat Bosco, approved the KSU IFC's decision to suspend the fraternity for the alcohol at the party at which Plaintiff was raped.

Additionally, Plaintiff has alleged plausible facts demonstrating that KSU had substantial control over the alleged assailants.  The alleged assailants are students at KSU, and thus they are under the disciplinary control of KSU.[44]  Therefore, the Court finds that Plaintiff has alleged plausible facts demonstrating KSU had substantial control over the assailants and the contexts of the assaults that allegedly occurred at the fraternity party at Pillsbury Crossing and at the fraternity house.[45]

---

[44]Doc. 1 at 3–4; *see Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999) (concluding that schools may be liable under Title IX where they are deliberately indifferent to reports of peer sexual harassment and where "the harasser is under the school's disciplinary authority").

[45]Plaintiff has not, however, alleged plausible facts demonstrating that the alleged assault that occurred in J.F.'s truck between the fraternity party at Pillsbury Crossing and the fraternity house occurred under a "program or activity" of KSU.

While Plaintiff's allegations do not reflect that KSU had *complete* control over the alleged assailants at the fraternity house or the fraternity parties, her allegations do reflect that KSU had *substantial* control over both the assailants and the fraternity. As the facts outlined above demonstrate, KSU allegedly devotes significant resources to the promotion and oversight of fraternities through its websites, rules, and Office of Greek Affairs. Additionally, although the fraternity is housed off campus, it is considered a "Kansas State University Organization," is open only to KSU students, and is directed by a KSU instructor. KSU also has the authority to sanction chapters for conduct that occurs at the off-campus, private fraternity houses, and KSU exercised that authority by suspending the chapter at issue here based on the presence of alcohol at the party where Plaintiff was allegedly raped. Presented with these allegations, the Court is convinced that the fraternity is an "operation" of the University, and that KSU has substantial control over student conduct within the fraternity.

KSU argues that the alleged sexual assaults at issue here did not occur within an education "program or activity." As an initial matter, the Court notes that KSU appears to have argued in its initial briefing that, as a general matter, activities occurring off campus and at private parties cannot give rise to Title IX liability.[46] KSU cites *Yeasin v. University of Kansas*, in which it argued in an amicus curiae brief "that Title IX does not require a school to sanction students for off-campus conduct."[47] In *Yeasin*, the Kansas Court of Appeals held that the University of Kansas did not have the authority to expel a student under Title IX for sexual harassment that occurred online, off campus, and not within a University sponsored program or

---

[46]Doc. 13 at 15, 20 ("Put simply, when sexual harassment occurs off university property and at a private event, there is no sexual harassment in the university's education programs and activities and thus no "substantial control" sufficient to trigger civil liability under Title IX."). KSU asserts in its reply that it has never argued "that it has *no* duty to investigate *any* sexual assaults that occur off campus." Doc. 32 at 21 (emphasis in original).

[47]360 P.3d 423, 430 (Kan. Ct. App. 2015).

activity.[48]  KSU focuses on a statement the court made that "[i]t seems obvious that the only environment the University can control is on campus or at University sponsored or supervised events."[49]  However, the court made clear that it was not resolving "whether Title IX requires a recipient to Title IX funds to discipline off-campus conduct."[50]  To the extent KSU argues here for a general prohibition on Title IX liability for harassment that occurs off campus, such a bright-line rule is foreclosed by *Rost*.[51]  Instead, the determination whether Title IX is implicated turns on whether the education institution "exercises substantial control over both the harasser and the context in which the known harassment occurs," and whether there is a "nexus between the out-of-school conduct and the school."[52]

KSU analogizes the allegations here to the *Rost*, *Roe*, *Ostrander*, *C.R.K.*, and *Samuelson* cases, in which courts declined to impose Title IX liability for sexual harassment that occurred off school grounds.  KSU further argues that Plaintiff has alleged no facts that would warrant a finding that it exercised substantial control over the harasser and the context in which the harassment occurred.  KSU emphasizes there are no allegations that it owned or operated Pillsbury Crossing or the fraternity house bedroom in which the alleged sexual assaults occurred, that it knew the parties were occurring, or that it had any contemporaneous control over how the parties were conducted.  KSU further argues it cannot simply enter into fraternity houses or off-campus fraternity events to monitor activity, and while the Fourth Amendment permits leeway in entering into on-campus dorm rooms, the same leeway does not apply to private fraternity

---

[48]*Id.* at 432.

[49]*Id.* at 430.

[50]*Id.*

[51]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX"); *see also* 21 U.S.C. § 1687 ("the term 'program or activity' and 'program' mean *all* of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." (emphasis added)).

[52]*Davis*, 526 U.S. at 645; *Rost*, 511 F.3d at 1121 n.1.

houses.[53]  KSU argues that even if it had authority to discipline the alleged assailants after the

assault, it did not have substantial control over the assailants or the context in which the assaults

occurred.  According to KSU, "such a notion would make an institution vicariously liable for

sexual harassment unless it *remediated* the effects of harassment."[54]  Finally, KSU asserts that it

is "unreasonable and unrealistic to suggest that K-State can monitor, let alone regulate,

unsanctioned activities that occur at every party spot in rural Riley County, Panama City Beach,

or Cancun."[55]

The Court finds unpersuasive KSU's arguments that this case is controlled by the

outcomes in *Rost*, *Roe*, *Ostrander*, *C.R.K.*, and *Samuelson*.  The facts in those cases are not

sufficiently analogous to command the same result in this case.  In *Rost, C.R.K.*, and *Samuelson*,

the alleged assaults occurred off school grounds, in private settings, and not in connection with

any school activity or organization.[56]  Although the assaults that give rise to a viable Title IX

claim here occurred at a private fraternity house and at an off-campus fraternity party, the Court

has detailed above the allegations that reflect KSU's substantial control over the fraternity and

the assailants.  These allegations demonstrate that KSU had more control over the context of the

assaults than the schools in *Rost, C.R.K.*, and *Samuelson* had over the context of the harassment

and assaults in those cases.  Likewise, in *Roe*, the peer assault occurred at a private apartment,

rather than at a fraternity house or fraternity event.[57]  As explained above, the fraternity here is

subject to oversight by the Office of Greek Affairs, rules promulgated by KSU, and potential

---

[53]*Reardon v. Wroan*, 811 F.2d 1025, 1028 & n.2 (7th Cir. 1987).

[54]Doc. 32 at 18.

[55]*Id.* at 19.

[56]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1117–18 (10th Cir. 2008); *C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145, 1147 (D. Kan. 2001); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1126 (D. Or. 2016).

[57]*Roe v. St. Louis Univ.*, 746 F.3d 874, 878 (8th Cir. 2014) ("The party was *not* an official fraternity event" (emphasis added)).

discipline of the chapter and its members for conduct that takes place at the fraternity house and at fraternity events like the party at Pillsbury Crossing.  The same cannot be said for the private apartment at issue in *Roe*.  Additionally, in *Ostrander*, the court found that the plaintiff had not offered sufficient evidence to establish that the university *or* the fraternity owned the private on-campus residence where the assault occurred, and thus Title IX was not implicated.[58]  Here, by contrast, the alleged assaults that give rise to Title IX liability took place at a house owned by the fraternity and at a fraternity event, and Plaintiff's allegations reflect that KSU exercises substantial control over the fraternity.[59]  In sum, these cases simply do not inform the result here because the alleged peer assaults in those cases occurred in contexts that were not controlled by the funding recipients, unlike in this case.

To be sure, KSU makes a valid argument that unlike in the dormitory context, the Fourth Amendment fully applies to private fraternity houses, and a university cannot simply enter a fraternity house on a whim.[60]  Further, KSU's suggestion that a university has significantly more control over dormitories than it does off-campus fraternity houses is generally accurate and unremarkable.  But rather than compelling a particular result in this case, the reference to dormitories simply helps set the outer bounds of Title IX liability.  At one end, peer sexual assaults that occur at on-campus dormitories clearly implicate Title IX.[61]  At the other end, peer sexual assaults that occur off-campus, in private settings, and within contexts that have little or

---

[58]*Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003).

[59]As explained above, the Court does not find that KSU had "substantial control" over the context of the alleged assault in J.F.'s truck between Pillsbury Crossing and the fraternity house.  *See supra* note 45.

[60]*See* Doc. 32 at 19–20.

[61]*See J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 WL 4446712, at *12 (D. Ariz. Sept. 30, 2008) (denying funding recipient's summary judgment motion and noting that it was undisputed that "[the university] exercised substantial control over [the alleged student-harasser] and the [university] dormitory in which the alleged harassment took place").

no connection to the funding recipient do not trigger Title IX liability.[62]  Peer sexual assaults that occur at off-campus fraternity houses or at official fraternity events that are subject to oversight, control, and disciplinary authority by a university appear to fall somewhere between these two bookends.  Here, as explained above, the fraternity allegedly is a KSU student organization, is supervised by a faculty advisor, is overseen by KSU's Office of Greek Affairs, is subject to KSU rules specifically applicable to fraternity parties and events, and was suspended by the KSU IFC for conduct at the party where Plaintiff was assaulted.  Thus, the Court is convinced that KSU has substantial control over the alleged assailants and the context in which the alleged assaults at Pillsbury Crossing and the fraternity house occurred.

KSU's next argument—that because it did not have "contemporaneous control" over the alleged assailants and the fraternity house and fraternity party, it lacked substantial control over the alleged assailant and the context of the sexual assaults—is similarly unavailing.[63]  KSU cites *Roe*, *Ostrander*, and *Samuelson* as authority for the proposition that substantial control does not exist where a funding recipient's disciplinary authority is limited to responding post-assault.  The Court, however, is not aware of any suggestion in these or other cases that the term "substantial control" equates to or necessitates "contemporaneous control."  The cases KSU presents appear to turn on findings that the funding recipients lacked *any* control over the contexts of the assaults in those cases, rather than findings that the funding recipients lacked *contemporaneous* control.[64]  Here, although KSU may fairly argue that its agents or employees were not contemporaneously

---

[62]*See, e.g., Rost*, 511 F.3d at 1122; *Roe*, 746 F.3d at 884.  *But see Simpson v. Univ. of Colo. Boulder*, 500 F. 3d 1170, 1178–85 (10th Cir. 2007) (finding plaintiff had presented sufficient evidence that university had substantial control over context of assaults, where assaults occurred at an off-campus apartment pursuant to an official policy that female student "hosts" show football recruits "a good time").

[63]*See* Doc. 32 at 18–19.

[64]*Roe*, 746 F.3d at 874; *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1132–32 (D. Or. 2016).

present at the scene of the alleged assaults, Plaintiff's allegations reflect that *both* the fraternity and the alleged assailants were subject to pre-assault oversight and post-assault disciplinary control by KSU.[65]

Finally, Contrary to KSU's contention, the Court is not convinced that a finding that Plaintiff has plausibly alleged KSU had substantial control over the context and alleged perpetrators of the assaults in this case will require KSU to monitor, regulate, and remediate all sexual harassment that occurs "at every party spot in rural Riley County, Panama City Beach, or Cancun."[66]  Rather, the Court simply finds that Plaintiff has presented plausible allegations in this case that KSU had substantial control over the fraternity (a KSU student organization) and the alleged assailants, thereby triggering a duty to adhere to the mandate of Title IX—that is, respond to Plaintiff's report of rape in a way that was not deliberately indifferent or "clearly unreasonable."[67]

### b.     Causation of Further Harassment

KSU argues for dismissal because Plaintiff has failed to allege that KSU's deliberate indifference to her report of rape caused her to suffer further harassment.  Plaintiff does not contest that she has not alleged further harassment, in the strictest sense, at the hands of the alleged assailant after her report of sexual assault.[68]  Rather, she alleges that the continued presence of the alleged assailants on campus caused her fear, which ultimately caused a deprivation of her educational access in the form of missing classes, declining academic

---

[65]*See Simpson*, 500 F.3d at 1177–78 (finding that university had substantial control over context of assaults that allegedly occurred at off-campus apartment and without any apparent supervision by university officials, where assaults occurred pursuant to policy to show football recruits a "good time").

[66]Doc. 32 at 19.

[67]*See Rost*, 511 F.3d at 1123 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)) ("The Supreme Court has noted that administrators need not 'engage in particular disciplinary action' under Title IX, but only respond in a manner that is not clearly unreasonable").

[68]*See* Doc. 27 at 26–30 (plaintiff arguing that she "need not show she was assaulted or harassed again").

24

performance, dropping of a class, loss of a scholarship, and decreased involvement in extracurricular activities.[69]  KSU does not argue that Plaintiff has failed to allege sexual discrimination that deprived her access to the educational benefits or opportunities provided by KSU.[70]  Thus, the parties do not dispute that plaintiff has alleged a deprivation of her educational access but has not alleged further harassment following her report of sexual assault.  The Court is therefore left with the purely legal question whether it is enough for a Title IX plaintiff to allege a deprivation of her educational access and that the funding recipient's deliberate indifference left her liable or vulnerable to further harassment, or whether she must also allege further harassment actually occurred after the funding recipient was on notice of the initial harassment.

The foundation of KSU's argument begins with *Davis*, in which the Supreme Court discussed the scope of Title IX liability.[71]  The Court explained:

> The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, *"cause [students] to undergo" harassment or "make them liable or vulnerable"* to it.[72]

Since *Davis*, courts have repeatedly echoed this last statement—that the funding recipient's deliberate indifference must "cause students to undergo" or make them "liable or vulnerable to" harassment.[73]

---

[69]Doc. 1 at 20–21.

[70]*See generally* Docs. 13 & 32.

[71]526 U.S. 629, 644–45 (1999).

[72]*Id.* (emphasis added).

[73]*See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1123–24 (10th Cir. 2008); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155 (10th Cir. 2006).

KSU focuses on two Tenth Circuit cases, *Escue v. Northern Oklahoma College* and *Rost*, to advance its argument that a Title IX plaintiff must allege further harassment.  In *Escue*, the court affirmed the district court's grant of summary judgment in favor of the university on the plaintiff's Title IX claims in part because the court found that the university was not deliberately indifferent to the student's reports of inappropriate touching and sexual comments by a professor.[74]  The court explained that the school's response to the report—which included removing the student from the harassing environment, questioning the student's peers and the professor about the charges, and preventing the professor from teaching any other classes after the semester ended—was not "clearly unreasonable in light of known circumstances."[75]  The court then made the following observation:

> Significantly, we note that [the plaintiff] does not allege that further sexual harassment occurred as a result of NOC's deliberate indifference. The Supreme Court has stated that "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."  For instance, in *Theno* [*v. Tonganoxie Unified School District Number 464*], a student was subjected to years of harassment by his peers. Although the school responded to discrete incidents, it issued only warnings to the perpetrators and sometimes required them to undergo counseling. Despite these measures, the student was still harassed. The *Theno* court found that summary judgment was inappropriate because "a reasonable jury certainly could conclude that at some point during the four-year period of harassment the school district's standard and ineffective response to the known harassment became clearly unreasonable."

> [The plaintiff's] arguments do not present a similar situation. At no point does she allege that NOC's response to her allegations was ineffective such that she was further harassed. Although [the professor] attempted to contact her once the day that she reported her allegations to [the university president], he was unsuccessful and this incident did not lead to sexual harassment. Summary judgment on these facts is therefore appropriate, as [the plaintiff] has not shown that NOC's response was clearly unreasonable nor has she shown that it led to further sexual harassment.[76]

---

[74]450 F.3d at 1155–56.

[75]*Id.* at 1155.

[76]*Id.* at 1155–56 (citations omitted).

In *Rost*, the court affirmed the district court's ruling that the student had not met her burden at summary judgment to present evidence that the school district acted with deliberate indifference to her reports of sexual harassment.[77]  The court emphasized the undisputed facts that after the student reported the sexual harassment, the school immediately contacted its school resource officer, who questioned the student about the harassment, and the principal had "approximately fifty conversations" with the officer regarding the investigation and received the officer's report.[78]  Citing *Escue*, the court then observed that the plaintiff did "not contend that further sexual harassment occurred as a result of the district's deliberate indifference after [the student]'s disclosure in 2003."[79]  The Court acknowledged that several circuits have "rejected a strict causation analysis which would absolve a district of Title IX liability if no discrimination occurs after a school district receives notice of discrimination."[80]

The court further noted that the Eleventh Circuit, in *Williams v. Board of Regents of the University System of Georgia*, held that Title IX discrimination can occur where a university fails to timely respond or take precautions to prevent further attacks.[81]  The court found that, unlike in *Williams*, the school district's response did not "cause [the student] to undergo harassment or make her liable or vulnerable to it," and in fact "the district took steps to prevent further harassment of [the student]."[82]  Ultimately, the court found the record reflected that the district did not act with deliberate indifference.[83]  But the court explained in dicta that if the student, whose mother had removed her entirely from the school district, "had expressed interest in

---

[77]511 F.3d 1114, 1123–24 (10th Cir. 2008).

[78]*Id.* at 1121.

[79]*Id.* at 1123.

[80]*Id.*

[81]*Id.* (citing *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007)).

[82]*Id.* at 1123–24.

[83]*Id.* at 1124.

returning to the school and school officials had not provided a safe educational environment, then she would likely have a Title IX claim.  But that is not this case."[84]

KSU interprets *Escue* and *Rost* as creating a requirement under *Davis* that a Title IX claimant undergo further harassment after an initial report of harassment.  For several reasons, the Court finds this interpretation unpersuasive.  First, the courts in *Escue* and *Rost* discussed the absence of further harassment in the context of analyzing the deliberate indifference element, rather than analyzing causation of further harassment as a stand-alone element.[85]  The courts explained the absence of further harassment to emphasize the lack of deliberate indifference.[86]  Unlike in those cases, here KSU does not argue that Plaintiff has failed to plead deliberate indifference.

Second, the courts in *Escue* and *Rost* did not state that further harassment was a requirement that all Title IX claimants must establish, but simply noted the absence of further harassment, and in *Escue* explained that it was "significant" to its determination on deliberate indifference.[87]  Declining to impose a strict further harassment requirement is consistent with *Davis*, in which the Court explained that funding recipients "may be held liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment."[88]

---

[84]*Id.*

[85]*Id.* at 1123–24; *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155–56 (10th Cir. 2006).

[86]*See Rost*, 511 F.3d at 1123 (explaining that student did not "contend that further harassment occurred as a result of the district's deliberate indifference after [her] disclosure in January 2003"); *Escue*, 450 F.3d at 1156 ("at no point does [the student] allege that [the university's] response to her allegations was ineffective such that she was further harassed"); *see also Ha v. N.W. Univ.*, No. 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (noting lack of further harassment in context of discussing deliberate indifference); *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 826–27 (M.D. Tenn. 2014) (finding that because plaintiff did not allege continuing harassment following his filing of a sexual harassment report, there was no basis to find defendant's response deliberately indifferent).

[87]*See Rost*, 511 F.3d at 1123; *Escue*, 450 F.3d at 1155.

[88]*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999).

Third, KSU argues that the court in *Rost*, by recognizing the lack of further harassment in that case, rejected the approach of the Eleventh Circuit in *Williams* that Title IX liability attaches where a "university fails to timely respond or take precautions to prevent further attacks."[89]  But the court in *Rost* simply distinguished *Williams*, rather than rejected its approach.  After citing *Williams*, the court explained that "[h]ere the district's response did not cause [the student] to undergo harassment or make her liable or vulnerable to it.  Unlike the situation in *Williams*, the district took steps to prevent further harassment of [the student] by working with [her mother] to find safe educational alternatives."[90]  In fact, the *Rost* court explained in dicta that if the student had expressed interest in returning to the school and the school district had employed the same course of conduct described in *Williams*—that is, "not provided a safe educational environment"—then there would have been a basis for Title IX liability.[91]

Finally, the courts that have directly addressed this issue have held that *Davis* requires that the funding recipient's deliberate indifference leave the student "liable or vulnerable to" further harassment, not that further harassment actually occur.[92]  Courts have consistently

---

[89]*Rost*, 511 F.3d at 1123 (citing *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007)).

[90]*Id.* at 1123–24 (internal citations omitted).

[91]*Id.* at 1124.

[92]*E.g., Kinsman v. Fla. State Univ. Bd. of Trs.*, No. 4:15CV235-MW/CAS, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015) (quoting *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003)) (holding that "[i]t does not require mental gymnastics" to conclude that further encounters "between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university."); *Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015) (citing cases that "all recognize that it is possible for a plaintiff to bring a Title IX claim against an educational institution even in the absence of any further affirmative acts of harassment by the alleged harasser or other students or faculty."); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) ("even absent actual post-assault harassment . . . the fact that [the alleged assailant] and plaintiff attended school together could be found to constitute pervasive, severe, and objectively offensive harassment.").

recognized that a student need not allege multiple instances of sexual assault to state a plausible Title IX claim.[93]

Where, as here, there is no question that the plaintiff has alleged (1) deliberate indifference on the part of the funding recipient,[94] (2) that the assault was so severe, pervasive, and offensive as to deprive her of the benefits and opportunities of a federally funded education program,[95] and (3) that the funding recipient's alleged deliberate indifference left her "liable or vulnerable to" further assaults or harassment,[96] the Court is not inclined to require that the plaintiff additionally allege that post-report assault or harassment actually occurred.  Rather, the Court is satisfied that Plaintiff has alleged the traditional Title IX elements previously outlined by the Tenth Circuit, as well as that KSU's response made her "liable or vulnerable to" further harassment pursuant to *Davis*.[97]

The Court finds that Plaintiff has alleged the elements required to state a plausible Title IX harassment claim.  Specifically, the Court finds that Plaintiff has plausibly alleged that KSU had substantial control over the alleged assailants and the context of the assaults, which were so severe as to deny Plaintiff access to educational benefits and opportunities, and that KSU's alleged deliberate indifference to her report of rape made her "liable or vulnerable" to further

---

[93]*E.g.*, *Karasek*, 2015 WL 8527338, at *12 (rejecting notion "that a student must be harassed or assaulted a second time before the school's clearly unreasonable response to the initial incident becomes actionable"); *T.Z. v. City of N.Y.*, 634 F. Supp. 2d 263, 270–71 (E.D.N.Y. 2009) (collecting cases and holding that "a sufficiently serious one-time sexual assault may satisfy the 'pervasiveness' requirement of the *Davis* standard."); *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1027 (E.D. Cal. 2009).

[94]Doc. 1 at 23; Doc. 32 at 13 n.3 (stating that KSU does not challenge Plaintiff's allegations as to deliberate indifference).

[95]Doc. 1 at 6, 20–21.

[96]*Id.* at 20–21 (alleging Plaintiff's fear of encountering assailant, and alleging that KSU's response made her more vulnerable to rape).

[97]*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999).

harassment or assault.  Accordingly, the Court denies KSU's motion to dismiss as it relates to Count 1.

### 2.      Count 2—Kansas Consumer Protection Act Claim

Plaintiff claims a violation of the KCPA in Count 2 of her Complaint.  She alleges KSU made written statements in its promotional materials, as well as oral statements, misrepresenting its fraternities as safe, concealing the risks of sexual assault, and omitting its policy of indifference toward sexual assault at its fraternities.  Plaintiff further alleges KSU made these representations when it knew or had reason to know (1) of many incidents of sexual assault at its fraternities, (2) that it would refuse to investigate such assaults; and (3) that the statements it made were misleading.

#### a.      Rule 9(b)

Pursuant to Fed. R. Civ. P. 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  This provision "applies to allegations of deceptive trade practices under the KCPA."[98]  Thus, to survive a motion to dismiss, an allegation of deceptive practices under the KCPA "must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[99]

In *Jamieson v. Vatterion Educational Center, Inc.*, a group of former students brought a KCPA claim against Vatterot, alleging that the education institution's agents and employees made verbal and written representations to the students, before and during their enrollments, about

---

[98]*Thompson v. Jiffy Lube Int'l Inc.*, 505 F. Supp. 2d 907, 930 (D. Kan. 2007) (citing *In re Univ. Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1150 (D. Kan. 2003)).

[99]*Id.* at 930 (internal quotation marks and citations omitted).

the completeness of the courses of study; the qualifications and competence of the faculty; the materials and equipment provided by Vatterott as part of the course of study; the accreditations Vatterott had received for the courses of study; Vatterott's job placement rates; and type and level of skills, training, and education Plaintiffs would obtain upon completion of their courses of study and their ability to obtain entry-level positions.[100]

The students further alleged Vatterott and its representatives "knowingly made false representations about the qualifications and possession of its sponsorships, accreditations, placement rates, status, [and] affiliations."[101]

In granting Vatterott's motion to dismiss, this Court found that the students failed to plead their KCPA claim with particularity in accordance with Rule 9(b).[102]  Specifically, the Court found that the students had not alleged the time, place, or contents of the false representations, or the identity of the speakers.[103]  First, the Court found that although the students had identified the subject of the misrepresentation, they failed to make any specific allegation about the content of the misrepresentation.[104]  Second, the students' allegation that the statements were made "before and during their enrollments" did not satisfy the particularity requirement as to "when" the statements were made.[105]  Third, the Court found the students failed to allege the place of the misrepresentations, as there was "absolutely no allegation about the location of the verbal misrepresentations," and the complaint did not specify whether the written misrepresentations were made on brochures, personalized letters, bills, e-mails, or any other form of written communication.[106]  Finally, the Court held that although the students

---

[100] 473 F. Supp. 2d 1153, 1155 (D. Kan. 2007).

[101] *Id.*

[102] *Id.* at 1156.

[103] *Id.* at 1156–58.

[104] *Id.* at 1157.

[105] *Id.*

[106] *Id.* at 1157–58.

"identified the types of employees who made misrepresentations (i[.]e. personnel working in admissions, career services, and financial aid), they [had] not identif[ied] who, within these broad classes of employees, made misrepresentations."[107]

The Court finds that, as in *Jamieson*, Plaintiff here has failed to plead her KCPA claim with particularity.  First, although Plaintiff alleges KSU made misrepresentations "regarding the safety of its fraternities, the risks of sexual assault at its fraternities, its position against investigating sexual assault at its fraternities, and its indifference to sexual assault at its fraternities," she does not allege with particularity the contents of these representations.  Second, Plaintiff does not allege when the misrepresentations were made.  Plaintiff alleges KSU made representations regarding the safety of its fraternities in materials to prospective students and their parents, thereby suggesting that the statements were made before her enrollment.  She also suggests in her responsive brief that the misrepresentations continued after she became a student, although she does not identify the content of these later representations.[108]  As this Court explained in *Jamieson*, allegations reflecting such broad time periods are not sufficiently particular for purposes of Rule 9(b).[109]  Third, Plaintiff does not allege the place where either the verbal or written representations were made.  Plaintiff alleges KSU made written statements regarding the safety of its fraternities to parents and prospective students, but she does not identify where these statements were printed, and only refers generally to "promotional materials" and KSU's website.[110]  Finally, Plaintiff identifies KSU as the entity responsible for making the representations, but does not specify the employees or agents of the university who

---

[107]*Id.* at 1158.

[108]*See* Doc. 27 at 32.

[109]*Jamieson*, 473 F. Supp. 2d at 1157.

[110]*See* Doc. 1 ¶¶ 57–60, 62.

actually made the verbal and written representations.  Presented with these allegations, the Court finds that Plaintiff has not satisfied the Rule 9(b) particularity requirement.

### b.        Requirement of Pleading Plaintiff was "Aggrieved"

In addition to pleading the when, where, what, and who of the alleged misrepresentations, a plaintiff bringing a KCPA claim must allege she is an "aggrieved consumer," that is, she "suffered some 'loss or injury' as a result of the violation."[111]  In *Finstad v. Washburn University of Topeka*, students in Washburn University's paralegal program alleged a KCPA violation based on misrepresentations in the University's course catalog advertising the program as accredited, when in fact it was not.[112]  The district court granted the University's motion for summary judgment because the students had not demonstrated a causal link between the University's false statement and the injuries the students suffered as a result of their enrollment in the program.[113]  In upholding the district court's finding, the Kansas Supreme Court clarified that the KCPA incorporates a causation requirement based on the requirement that a plaintiff bringing a private cause of action under the Act suffer some loss or injury "as a result of the violation" of the Act.[114]  Because the students did not rely on the false statement, they could not establish that they were "aggrieved" by a KCPA violation.[115]  The court further explained that

> many, if not all, of the students were unaware of the statement.  Many enrolled prior to the publication of the statement in the university catalogue.  Nor is there any showing that any of the students suffered injury or loss as a result of the publication of the statement.  The students enrolled and paid the tuition.  By so

---

[111]*Caputo v. Prof'l Recovery Servs., Inc.*, 261 F. Supp. 2d 1249, 1261 (D. Kan. 2003) (citing *Finstad v. Washburn Univ.*, 845 P.2d 685 (Kan. 1993)).

[112]845 P.2d at 692.

[113]*Id.* at 688.

[114]*Id.* at 692.

[115]*Id.* at 691.

doing, they were consumers under the KCPA; however, the Act requires more in that they must also be aggrieved by the violation.[116]

Similarly, the Court finds here that Plaintiff has failed to allege plausible facts that she was an "aggrieved" consumer within the meaning of the KCPA.  Plaintiff makes a single conclusory allegation in her Complaint that "she is 'aggrieved' as that term is used in K.S.A. §§ 50-634 and 636."[117]  But she does not allege that she was aware of, much less relied on, KSU's representations regarding its perception of the safety of its fraternities or its position concerning sexual assaults in fraternities.  Plaintiff points to several alleged statements on KSU's website and in its publications touting its fraternities as safe and fun experiences, but she does not allege that these representations were factors in her decision to attend the fraternity party on April 26, 2014.  Thus, the Court finds that Plaintiff has failed to plead the element of causation required to plausibly allege that she was an "aggrieved consumer" under the KCPA.

Because Plaintiff has not pleaded the elements of her KCPA claim with particularity, and because she has not presented plausible allegations that she was "aggrieved" by KSU's alleged violation of the KCPA, the Court dismisses Plaintiff's KCPA claim.  Plaintiff requests in passing in her response that the Court grant her leave to amend her Complaint to plead her claims with particularity in the event the Court finds her allegations insufficient to state a KCPA claim.  D. Kan. Rule 15.1 requires that a party moving for leave to amend attach a proposed pleading so that the Court can determine whether leave to amend is appropriate.[118]  "This Court does not routinely grant leave to amend a motion to dismiss in the absence of a motion for leave to amend, or at least some representation that there are additional facts that may cure the

---

[116]*Id.*

[117]Doc. 1 at 26.

[118]D. Kan. Rule 15.1.

deficiency."[119]  Plaintiff provides neither a proposed pleading nor any indication that she can present additional facts to cure the deficiencies the Court has identified above.[120]  Accordingly, Plaintiff is denied leave to amend and her Count 2 KCPA claim is dismissed.

### c.      Count 3—Negligence Claim

Plaintiff brings a negligence claim in Count 3 of her Complaint, alleging KSU breached its duty to regulate, warn, protect her from, or otherwise make reasonably safe the foreseeably dangerous environment at the fraternity house and fraternity party relevant to this case.  This suit is subject to the Kansas Tort Claims Act ("KTCA") because KSU, as a political subdivision of the state, is a "municipality" within the meaning of the KTCA.[121]  The KTCA provides:

> (a) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.[122]

The Kansas Supreme Court has explained that

> the analytical matrix established by the legislature in enacting the KTCA dictates that a governmental entity can be found liable for the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment only if (1) a private person could be liable under the same circumstances and (2) no statutory exception to liability applies.[123]

---

[119]*McCoy v. City of Independence, Kan.*, No. 12-1211-JAR-JPO, 2013 WL 424858, at *1 n.3 (D. Kan. Feb. 4, 2013).

[120]Plaintiff has filed a Motion for Leave to Amend Complaint (Doc. 36) to add another KSU student who alleges she was also assaulted by J.G.  Plaintiff has attached her proposed First Amended Complaint (Doc. 36-1) to that motion. The proposed First Amended Complaint does not add any allegations in support of her KCPA claim that would cure the deficiencies described above.  *See infra* Part II.

[121]K.S.A. 75-6102(b).

[122]K.S.A. 75-6102(a).

[123]*Adams v. Bd. of Sedgwick Cty. Comm'rs*, 214 P.3d 1173, 1179 (Kan. 2009).

The Court first addresses whether a private person could be liable under the same circumstances.  There is no dispute that a private person can be liable for negligence.[124]  Thus, the Court must determine whether Plaintiff has alleged a plausible negligence claim.  The familiar elements of a negligence claim are (1) the defendant owed a duty to the plaintiff; (2) the defendant breached this duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff sustained injuries.[125]

KSU argues that Plaintiff fails to allege facts demonstrating that KSU owed her a legal duty.  Plaintiff responds that she "sufficiently pled facts showing K-State controlled its fraternity system, thereby assuming a legal duty."[126]  Whether a duty exists is a question of law.[127]  "It is the general rule that an actor has no duty to control the conduct of a third person to prevent that person from causing harm to others unless a 'special relationship' exists between the actor and the third party or the actor and the injured party."[128]  In *Nero v. Kansas State University*, the Kansas Supreme Court held that the "university-student relationship does not in and of itself impose a duty upon universities to protect students from the actions of fellow students or third parties.  The in loco parentis doctrine is outmoded and inconsistent with the reality of contemporary college life."[129]  Nevertheless, the *Nero* court overturned the trial court's grant of summary judgment in favor of the university on the student's negligence claim, which was based on allegations of sexual assault by another student at a coed residence hall on the university's

---

[124]*Thomas v. Cty. Comm'rs of Shawnee Cty.* 262 P.3d 336, 352 (Kan. 2011) (citing *Adams*, 214 P.3d 1173).

[125]*E.g.*, *Adams*, 214 P.3d at 1179 (citing *Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169 (Kan. 1999)).

[126]Doc. 27 at 33.

[127]*Adams*, 214 P.3d at 1179–80 (citing *Nero v. Kan. State Univ.*, 861 P.2d 768 (Kan. 1993)).

[128]*Nero*, 861 P.2d at 772 (citing *Thies v. Cooper*, 753 P.2d 1280 (Kan. 1988)).

[129]861 P.2d at 773–78; *see also Howell v. Calvert*, 1 P.3d 310, 313 (Kan. 2000); *Wellhausen v. Univ. of Kan.*, 189 P.3d 1181, 1185 (Kan. Ct. App. 2008).

campus.[130]  The court found that the university owed the student a duty of reasonable care based on its landlord-tenant relationships with both the victim and the alleged assailant.[131]

Based on the holdings in *Nero* and its progeny, the Court finds that the university-student relationships between KSU, Plaintiff, and the alleged assailants do not give rise to a legal duty owed to Plaintiff.  Although Plaintiff asserts that KSU owed a duty of reasonable care to her based on KSU's control of its fraternity system, this does not provide the basis for a legal duty. As explained above, the special relationship doctrine depends on a relationship between the actor (here, KSU) and either the injured party (Plaintiff) or the third party (the alleged assailants). KSU's control of its fraternity system does not create a special relationship between the parties beyond that of a university and its students.  Furthermore, to the extent Plaintiff asserts the existence of a duty premised on a landlord-tenant relationship similar to that at issue in *Nero*, this argument is also foreclosed, as KSU is not a landlord or owner of the fraternity house, and the fraternity house is not on KSU property.[132]  In sum, the Court finds that because Plaintiff has not alleged the existence of a special relationship between KSU and either her or the alleged assailant, she has not presented plausible allegations that KSU owed her a legal duty. Accordingly, the Court dismisses Plaintiff's Count 3 negligence claim.[133]

---

[130]*Nero*, 861 P.2d at 779–80.

[131]*Id.*

[132]*See Nero*, 861 P.2d at 779–80 (finding that negligence claim premised on landlord-tenant relationship could proceed because university, as a "landlord furnishing housing to its students in competition with private landlords[, ]owes a duty of reasonable care to its tenants"); *Gragg v. Wichita State Univ.*, 934 P.2d 121, 133 (Kan. 1997) (distinguishing *Nero* on basis of landlord-tenant liability); *Howell*, 1 P.3d at 313 ("*Nero* holds that a university has a duty to regulate and supervise foreseeable dangers and activities occurring *on* its property.") (emphasis in original).

[133]Because the Court finds that plaintiff has not alleged the existence of a legal duty, the Court does not address the remaining elements of her negligence claim or the immunities implicated by the second prong of the KTCA "analytical matrix."  *See Adams v. Bd. of Sedgwick Cty. Com'rs*, 214 P.3d 1173, 1190 (Kan. 2009) (citing *Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169 (Kan. 1999)) (explaining that "[b]ecause we conclude that there was no duty, we need not address the question of whether" the various KTCA immunities apply).

D.      **Conclusion**

Plaintiff has presented plausible allegations as to each element required to state a Title IX discrimination claim, including that KSU had substantial control over both the alleged assailants and the context of the alleged assaults, and that KSU's alleged deliberate indifference made Plaintiff liable or vulnerable to further harassment or assaults.  Accordingly, the Court denies KSU's motion to dismiss as to Count 1.  The Court, however, grants KSU's motion as to Count 2 because Plaintiff has failed to plead the elements of her KCPA claim with particularity and has failed to plausibly allege that she was an "aggrieved consumer."  Further, the Court denies Plaintiff leave to amend her KCPA claim because she has not attached a proposed pleading to her motion and has not indicated any additional facts that would cure her pleading deficiencies. Finally, the Court grants KSU's motion as to Count 3 because Plaintiff has not presented plausible allegations to support a finding that KSU owed her a legal duty.

II.     **Motion for Leave to Amend**

Plaintiff moves for leave to amend her Complaint to join Crystal Stroup, another KSU student, as a Plaintiff in this case based on new information Plaintiff allegedly learned after filing her original Complaint.  Plaintiff alleges in her proposed First Amended Complaint ("FAC") that Ms. Stroup was raped by J.G. after Plaintiff reported her rapes by J.G. and J.F. to KSU.

A.      **Proposed Amended Complaint**

The FAC alleges the following "new information" in support of the proposed joinder of Ms. Stroup:

On October 6, 2015, J.G. raped Ms. Stroup at University Crossings, a private off-campus apartment complex close to the KSU campus, after Ms. Stroup's roommates left her alone with J.G. in an extremely intoxicated state.  Neither Ms. Stroup nor her roommates knew of Plaintiff's

prior report of sexual assault by J.G. to KSU.  The day following the rape, Ms. Stroup went to the hospital and underwent a rape kit and reported the rape to the police.  Ms. Stroup waited several months before she reported the rape to KSU because she had learned that KSU did not investigate sexual assaults that occur off campus.  During this time, Ms. Stroup suffered many actual and threatened encounters with J.G., which affected her academic performance and caused her emotional trauma.  Ms. Stroup eventually reported the rape to the KSU Center for Advocacy, Response, and Education ("CARE").  In response to her report, the CARE office did not inform Ms. Stroup of KSU's sexual misconduct or Title IX policies, and did not inform her of the option to file a complaint against J.G. with the KSU Office of Institutional Equity ("OIE").  In July 2016, J.G. was arrested for the rape of Ms. Stroup on October 6, 2015, and was criminally charged in Riley County with the rape of both Ms. Stroup and Plaintiff.  That same month, after learning of J.G.'s arrest, KSU engaged in a threat assessment and expelled J.G. from campus. J.G. now lives more than 100 miles from the KSU campus.

The FAC asserts Title IX and negligence claims on behalf of Ms. Stroup.  Ms. Stroup alleges in support of her proposed Title IX claim that KSU was deliberately indifferent to Plaintiff's prior reports of sexual assault, and that this deliberate indifference created a climate of tolerance of sexual assault, thereby leading to the assault of Ms. Stroup and the denial of her access to educational opportunity and benefits.  Ms. Stroup alleges in support of her negligence claim that KSU breached its duty to protect her from certain dangers, including reasonably foreseeable sexual violence, and that this breach proximately caused her injuries.

KSU notes that, in addition to the allegations concerning the assault of Ms. Stroup, Plaintiff inserts allegations in support of her original claims, including allegations explaining a similar lawsuit filed by KSU student Tessa Farmer, studies regarding rape recidivism and the

prevalence of sexual harassment on KSU's campus, and statements by a former KSU OIE employee expressing her concerns about KSU's policies concerning and responses to sexual assaults.

**B.    Discussion**

Pursuant to Fed. R. Civ. P. 15(a), "[a] party may amend its pleading once as a matter of course" within 21 days after serving it, or within 21 days after service of a responsive pleading or a Rule 12 motion.[134]   Thereafter, "a party may amend its pleadings only with the opposing party's written consent or the court's leave."[135]   Under Rule 15(a), leave to amend a complaint is freely given when justice so requires.   Rule 15 is intended "to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"[136] Courts may deny leave to amend, however, based on "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."[137]   "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason."[138]   Whether to allow a proposed amendment after the permissive period addresses the sound discretion of the court.[139]

The Court finds that the proposed joinder of Ms. Stroup would be futile.   First, with regard to her proposed Title IX claim, Ms. Stroup does not allege plausible facts that the sexual

---

[134]Fed. R. Civ. P. 15(a)(1).

[135]Fed. R. Civ. P. 15(a)(2).

[136]*Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)).

[137]*Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[138]*Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir. 2001) (citing *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858–59 (10th Cir. 1999)).

[139]*See id.*; *Foman*, 371 U.S. at 182; *Wilkerson v. Shinseki*, 606 F.3d 1256, 1268 (10th Cir. 2010).

assault at issue occurred within a "program or activity" of KSU.[140]  Unlike the alleged assaults of

Plaintiff, which occurred at a fraternity event and in a fraternity house, the alleged sexual assault

of Ms. Stroup occurred at a private off-campus apartment, and not in relation to any fraternity

event.[141]  Under these circumstances, the Court cannot find that KSU had "substantial control"

over the context of the assault.  Additionally, Ms. Stroup's negligence claim suffers the same

shortcomings as Plaintiff's negligence claim, i.e., she does not present plausible allegations that

reflect the existence of a special relationship such that KSU owed a duty to protect her from

harms caused by a third party.[142]  Accordingly, the Court finds that joinder of Ms. Stroup would

be futile.

Additionally, the Court finds that the proposed allegations in the FAC that do not relate to

Ms. Stroup—including the allegations as to the case involving Tessa Farmer, studies regarding

rape recidivism and the prevalence of sexual harassment on KSU's campus, and statements by a

former KSU OIE employee—are untimely and unduly prejudicial.  As KSU correctly asserts,

Plaintiff did not mention these additional allegations in her motion for leave to amend.  Rather,

her motion focuses entirely on the joinder of Ms. Stroup as a co-Plaintiff.[143]  In her Reply,

Plaintiff addresses these additional allegations.  But unlike the "new information" that forms the

basis for joining Ms. Stroup, Plaintiff does not assert that the information supporting these

additional allegations was unavailable to her at the time she filed her original Complaint.

Plaintiff moved for leave to add these allegations more than four months after the motion to

dismiss on her original Complaint was fully briefed.  Without any indication that these additional

---

[140]20 U.S.C. § 1681(a); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).

[141]*See Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (holding that University did not have substantial control over context of sexual assault that occurred at a party at an off-campus apartment, where party was not an official fraternity event).

[142]*See supra* Part I.C.3.

[143]Doc. 36.

allegations were unavailable to Plaintiff at the time she filed her original Complaint, these proposed allegations are untimely.[144]  Furthermore, the proposed allegations do nothing to cure the deficiencies the Court has identified in Plaintiff's KCPA and negligence claims.  Thus, the benefits of allowing Plaintiff to amend would be outweighed by the undue prejudice to KSU in allowing Plaintiff to add these untimely allegations, which were not central to her motion for leave to amend.

Because Plaintiff's proposed joinder of Ms. Stroup would be futile, and because her additional allegations are untimely and unduly prejudicial, the Court denies Plaintiff's motion for leave to amend.

## III.    Motion to Strike

KSU moves to strike portions of Plaintiff's proposed FAC that allege statements by a former KSU OIE employee concerning KSU's policies regarding response to complaints of sexual assaults at the University.  KSU argues that the statements contain confidential attorney-client communications.  As explained above, the Court denies Plaintiff's motion for leave to amend.[145]  The Court therefore finds KSU's motion moot to the extent it wishes to prevent Plaintiff from using the identified statements in a later-filed FAC.  The Court is mindful, however, that the statements appear in the record in Plaintiff's proposed FAC.  The Court therefore orders Plaintiff to file a copy of her proposed FAC with the portions of Paragraph 68 identified in KSU's motion and all of Paragraph 69 redacted.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Kansas State University's Motion to Dismiss for Failure to State a Claim (Doc. 12) is **granted in part and**

---

[144]*See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (quoting *Frank v. U.S. W.*, 3 F.3d 1357 (10th Cir. 1993)) ("We have held that denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'").

[145]*See supra* Part II.

**denied in part.**  Defendant's motion is **denied** as to Plaintiff Sara Weckhorst's Count 1 Title IX claim, and **granted** as to Plaintiff's Count 2 KCPA and Count 3 Negligence claims.  Plaintiff is **denied** leave to amend her Count 2 KCPA claim.

   **IT IS FURTHER ORDERED BY THE COURT** that Plaintiff Sara Weckhorst's Motion for Leave to Amend Complaint (Doc. 36) is **denied**.

   **IT IS FURTHER ORDERED BY THE COURT** that Defendant Kansas State University's Motion to Strike Portions of Proposed First Amended Complaint (Doc. 40) is **granted in part**.  Plaintiff shall file with the Court a version of her proposed First Amended Complaint with all statements recounting conversations with Kansas State University General Counsel redacted.

   **IT IS SO ORDERED.**

  Dated: March 13, 2017

              S/ Julie A. Robinson
              JULIE A. ROBINSON
              UNITED STATES DISTRICT JUDGE